UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOYCE POWELL,

                      Petitioner,

     -vs-

SUPERINTENDENT SABINA KAPLAN,

                    Respondent.

**No. 1:12-cv-00954-MAT**
**DECISION AND ORDER**

---

## INTRODUCTION

<u>Pro se</u> petitioner Joyce Powell ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that she is being detained in Respondent's custody in violation of her Federal constitutional rights. Petitioner is incarcerated as the result of a judgment of conviction entered against her on June 12, 2007, in Supreme Court of the State of New York, County of Monroe (Affronti, J.), following a jury verdict convicting her of two counts of Burglary in the First Degree (N.Y. Penal Law ("P.L.") § 140.30(2), (3)) and one count of Assault in the Second Degree (P.L. § 120.05(2)).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.   Petitioner's Trial

Petitioner's conviction arises from an incident that occurred on October 8, 2006, in which Petitioner, her son, and several other unidentified individuals broke into the home of Petitioner's

acquaintance, Robin Jackson ("Jackson"), and assaulted her.

## A.   The Prosecution's Case

Two days prior to the assault at issue, Petitioner had called Jackson, with whom she had been friends for over sixteen years. They had not seen each other in about two years, and Jackson was happy to hear from Petitioner. However, Petitioner became upset while she and Jackson were discussing Cherreka Bryan ("Bryan"), who had a child by Petitioner's deceased son, David Wright. Petitioner commented to Jackson, "[O]h, that bitch called them crackers on me. I'm not F'g with her because she called them crackers on me about my grandchild and told them it wasn't even my grandchild." (T.326-27)[1]. Bryan happened to be at Jackson's house at the time of the phone call. Jackson pleaded with Petitioner not to bring "the drama" to her house. Petitioner threatened Bryan and announced that she was coming over to Jackson's house.

When Petitioner arrived at Jackson's house about 15 to 20 minutes later, Jackson immediately called 911. Petitioner walked up the steps to the porch and pushed Jackson against a wall, grabbing her by the neck. Jackson's daughter intervened, and Petitioner began fighting with her. Jackson testified that during the melée, Petitioner took out a can of mace and sprayed it into the air. Petitioner then returned to her minivan and tried to drive away.

---

[1]

Citations to "T." in parentheses refer to page numbers of the Petitioner's trial transcript filed by Respondent in connection with her response to the Petition.

However, after only about 20 feet she brought the minivan to a stop.

Officer John Nobrega ("Nobrega") of the Rochester Police Department ("RPD") had responded to the scene and watched as Petitioner was getting out of her vehicle. Petitioner informed Nobrega that she had been hit with pepper spray. Although her eyes appeared irritated to Nobrega, he testified that she lacked the "decolorated liquid on her face" typically seen when someone has been sprayed directly in the face with pepper spray. (T.429-430). As Nobrega spoke with Petitioner, a young man who was walking with a limp got into her van. (T.431-32). Bryan testified that she saw Petitioner's son, Terrel "TJ" Blake ("Terrel"), who walks with a limp, approach Petitioner's van "after the police [officer] was leaving." (T.401).

Two days later, at about 8:00 p.m., Jackson was lying on the couch, watching television and "dozing and out," when she heard what sounded like a gunshot and saw a hole in her front window. (T.336). She rolled onto the floor. The whole window shattered, as did a side window. She then saw Terrel, whom she has known as long as she has known Petitioner, coming in through the front door. (T.341-42). She recognized his "really severe limp in both legs and his hands and his arms." (T.342). The next person to enter was Petitioner, whose mouth was covered by a black bandana, but the rest of her face was visible. (T.343-44). Terrel attacked Jackson

-3-

with a rubber mallet, while Petitioner struck her with a miniature baseball bat. (T.345-48). Jackson was huddled upon on the floor trying to protect herself from the blows. (T.348). There were about six other people present whom Jackson did not recognize. During the fracas, someone broke a lamp over Jackson's head. Petitioner heaved a coffee table at Jackson's back. (T.348). Pulling out a can of mace, Petitioner shouted, "[Y]eah, bitch, I missed you the first time, I'm not gonna miss you this time." (T.350). Petitioner sprayed Jackson with mace while repeating, "[Y]eah, bitch." (T.350). At some point, Jackson stated, she was picked up and thrown out the front window. (T.351-52).

At around the same time, Bryan, who lived several houses down from Jackson, heard yelling coming from the street. Bryan saw a couple of people wearing masks walk past her house. She recognized one of them as Terrel, based on his limp and by seeing the side of his face. Bryan and some other neighbors went down to Jackson's house where they found her lying in the grass.

At 8:40 p.m., RPD Officer Corey Clark ("Clark") arrived at the scene and noticed that Jackson was bleeding from her head, with a knot above her right eye and blood all over her shirt. Upon entering Jackson's house, Clark noticed that the front and porch windows were broken, the door had been kicked in, the living room was in disarray, and there was a strong odor of pepper spray in the air. Jackson was taken to the hospital, where she was treated for

-4-

a lacerated liver, a fractured spine, and a laceration to her head that required stitches.

## II.  The Defense Case

Andrew Stankevich ("Stankevich"), who had been friends with Petitioner for about 3 or 4 years, testified that on October 6, 2006, Petitioner called and asked him if she could have a Bible study at his house. (T.455-56). He told her "that would be great for Sunday," the 8th of October. On Sunday, Petitioner arrived at Stankevich's about 7:00 p.m., "did her sermon thing," and left at about 9:00 p.m.  (T.457-58).

Petitioner testified that on October 6, 2006, Jackson had left several telephone messages for her.  (T.477-78). After Petitioner returned the calls, she went to Jackson's house to see her granddaughter (Bryan's daughter). (T.480-81). When she arrived, Jackson was on the telephone calling for the police. (T.483). When Petitioner asked why, Jackson dropped the phone and punched her in the face (T.486). Then, others "started jumping on [her]," and Jackson burned her with something (T.487). Bryan came out of the house and maced Petitioner "all in [her] face," leaving her "completely blind" (T.488). She managed to escape to her van but as she was sitting in it, Jackson and Bryan opened the door, rifled through her purse, and stole two credit cards and $500 in cash. (T.491-92).

Petitioner related that ambulance personnel treated her before

-5-

Nobrega arrived. (T.493). Her godson, Netrell, arrived and got in the van with her; Petitioner testified that Terrel was not present. (T.495). She was eventually treated at the hospital for burns and mace exposure, and she filed charges against Bryan. (T.499-500).

On October 8, 2006, she went to Stankevich's house for a Bible study from 7:00 to 9:00 p.m. T.501-03. She returned home "a little before 10:00." (T.504). She denied going to 61 Copeland at around 8:30 p.m. or having any contact with Terrel on that day. (T.504, 506, 510). After she arrived home, she saw her sister-in-law, Sharon Blake ("Sharon"). (T.471-73). Sharon testified that Petitioner came over at about 1:15 a.m. and stayed over night, which she did every now and then. (T.472).

### III. Verdict, Sentence, and Direct Appeal

Petitioner was found guilty of two counts of first-degree burglary and one count of second-degree assault. On June 12, 2007, she was sentenced to an aggregate determinate sentence of 16 years in prison plus 5 years of mandatory post-release supervision ("PRS").

Represented by counsel, Petitioner pursued a direct appeal of her conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. The conviction was unanimously affirmed, and leave to appeal to the New York Court of Appeal was denied. People v. Powell, 79 A.D.3d 1791 (4th Dep't 2010), lv. denied, 17 N.Y.3d 799 (2011).

## IV.  **The Federal Habeas Petition**

This timely habeas petition followed. Petitioner characterizes her petition as a "gateway petition on the grounds of actual innocence" and requests that the Court "allow her to submit a habeas petition, and/or issue a writ of habeas corpus pursuant to 28 U.S.C. 2254." Petition ("Pet.") (Dkt #1), p. 2 of 69. Petitioner states that "[i]f, and only if, this Court declines [her] gateway petition, [she] requests that the Court grant her leave to return to the state courts to file a writ of <u>coram</u> <u>nobis</u> and exhaust her claim for ineffective assistance of appellate counsel." <u>Id.</u> Petitioner proceeds to devote almost her entire brief to arguing why her actual innocence claim is meritorious and should serve as cause to overcome the procedural default of any other claims. However, Petitioner does not specify which other claims she is raising. Finally, Petitioner requests an evidentiary hearing and subpoenas with regard to multiple witnesses and categories of documents.

Though it is unclear exactly what Petitioner is requesting, the Court, as Respondent has done, has liberally construed the petition to raise all the claims Petitioner raised on direct appeal, along with a claim of actual innocence. Respondent has asserted the defenses of non-exhaustion and procedural default and argues, in any event, that all of Petitioner's claims lack merit. In the interest of judicial efficiency, the Court has elected to

bypass the various procedural hurdles to certain of Petitioner's claims in order to consider them on the merits.[2]

For the reasons discussed below, Petitioner's request for a writ of habeas corpus is denied. Her requests for a stay, for permission to amend the petition, and for an evidentiary hearing also are denied.

## MERITS OF THE PETITION

### I. Verdict Against the Weight of the Evidence

Petitioner asserts, as she did on direct appeal, that the verdict was against the weight of the evidence because Jackson's identification testimony was not credible. Petitioner argued on direct appeal that Jackson had a poor opportunity to observe her attackers, since she was roused from sleep in her darkened living room, which was lit only by the light of the television; she then immediately rolled onto the floor and moved to a corner of the room. Petitioner argued, based on research studies on the inaccuracies of eyewitness identifications, that Jackson would have been intensely focused on the weapons confronting her, and not the individuals wielding those weapons. Petitioner also contended that Jackson had reason to fabricate testimony against her because it

---

[2]

See, e.g., Woodard v. Chappius, No. 6:13-CV-6123 MAT, 2014 WL 122359, at *6 (W.D.N.Y. Jan. 13, 2014), aff'd, 631 F. App'x 65 (2d Cir. 2016) ("In the interests of judicial economy, the Court will dispose of both of these [unexhausted but procedurally defaulted] claims on the merits.'") (citing, inter alia, Lambrix v. Singletary, 520 U.S. 518, 523 (1997) (stating that "hurdling" the procedural bar is justified by a habeas court when the merits of a claim are easily resolvable against the petitioner)).

appeared that Petitioner was in some dispute with Jackson's daughter regarding access to Petitioner's grandchild. The Appellate Division, after "according great deference to the jury's resolution of credibility issues, . . . conclude[d] that the verdict is not against the weight of the evidence[.]" Powell, A.D.3d at (citation omitted).

As Respondent argues, this claim is not cognizable on Federal habeas review because it is derived from a State statutory provision, New York Criminal Procedure Law ("C.P.L.") § 470.15(5), which permits an appellate court to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5). See also People v. Bleakley, 69 N.Y.2d 490, 495 (1987) (explaining that while a legal insufficiency claim is based on Federal due process principals, a weight of the evidence argument is purely a State law claim grounded in New York's criminal procedure statute). Because Petitioner's weight of the evidence claim implicates only State law, it is not cognizable in this Federal habeas proceeding. See 28 U.S.C. § 2254(a) (permitting Federal habeas corpus review only where the petitioner has alleged that he is in State custody in violation of "the Constitution or a [F]ederal law or treaty"); Ex parte Craig, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence .

. ."), <u>aff'd</u>, 263 U.S. 255 (1923).

## II.  **Error in Dismissing a Sworn Juror**

As she did on direct appeal, Petitioner claims that the trial court erred in discharging a sworn juror who, prior to opening statements, informed the trial court that he had seen a short news segment describing Petitioner as a community activist. (T.314). After the trial court explained that only evidence presented at trial could be considered by the jury, the juror stated, "[U]sually when I hear [community activist] I think of Martin Luther King and anything like that. If you're an activist on something like that I immediately assumed why would someone like that commit a crime[?]" (T.315). The juror mentioned multiple times that the information about Petitioner's community activism was "sticking in [his] mind." (T.317). The trial court engaged the juror in a colloquy regarding his ability to be a fair juror, which culminated in the following exchange:

| The Court: | You're saying that you cannot be fair to the prosecution, is that what you're indicating? |
| [Juror]: | Yes, in a way it is going to stick in my mind because I have always watched those things. I don't know. |
| . . . | |
| The Court: | So you're saying that this will stick in your mind and, therefore, this will be something that will carryover and has [sic] some affect [sic] and some impact on your objectivity, correct? |
| [Juror]: | It very well might possibly. |

(T.318). The prosecutor and defense counsel declined to question

the juror further. Neither party objected when the trial court stated he was discharging the juror. (T.319). The trial judge explained that the juror had been discharged "based on his obvious and very blatant comments to the [c]ourt that he cannot be fair to the prosecution in this trial and that anything he may have heard last night, as he stated, will have an impact on his objectivity." (T.319). Again, neither party objected.

On direct appeal, the Appellate Division held that the claim was unpreserved, and, in any event, without merit. Under the circumstances of this case, the Appellate Division concluded, the trial court "properly discharged the juror from service pursuant to CPL 270.35[.]"[3] (citations omitted).

"The allegation of improper discharge of a juror is generally an issue of State law not cognizable on habeas review." Williams v. LaClair, No. 08CIV.11354SASJCF, 2010 WL 129810, at *4 (S.D.N.Y. Jan. 13, 2010) (citing Johnson v. Artuz, No. 00 Civ. 6106, 2006 WL1144513, at *6 (W.D.N.Y. May 1, 2006); Khan v. Fischer, 583 F. Supp.2d 390, 391 (E.D.N.Y. 2008)). Petitioner's claim, as articulated on appeal, was that the discharged juror was not "grossly unqualified" as defined by New York State caselaw, i.e.,

---

[3]     C.P.L. § 270.35 provides in part as follows:

If at any time after the trial jury has been sworn and before the rendition of its verdict, . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case . . ., the court must discharge such juror. . . .

N.Y. CRIM. PROC. LAW § 270.35(1).

People v. Buford, 69 N.Y.2d 290 (1987). In Buford, the New York Court of Appeals relied solely on its own precedents and not Federal constitutional law to define this term. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Because Petitioner's claim fails to raise a claim of Federal constitutional magnitude, it must be dismissed as not cognizable on habeas review.

## III. Harsh and Excessive Sentence

On direct appeal, Petitioner urged the Appellate Division to exercise its discretion to reduce her sentence in the interest of justice, on the basis that Petitioner was a well-known pastor and anti-violence activist. The Appellate Division held that the sentence was neither harsh nor severe.

Petitioner was sentenced to concurrent determinate terms of 16 years in prison on each of the Burglary in the First Degree convictions, both of which are Class "B" violent felonies. See N.Y. PENAL LAW § 140.30(2), (3)). This sentence falls within the statutory range. See N.Y. PENAL LAW Penal Law § 70.02 (1)(a), (3)(a) (for a Class "B" violent felony, sentence must be at least 5 years and may not exceed 25 years). On the Assault in the Second Degree conviction, a Class "D" violent felony, see N.Y. PENAL LAW § 120.05(2), Petitioner was sentenced to 7 years in prison. This sentence also falls within the statutory range. See N.Y. PENAL LAW

§ 70.02 (1)(c), (3)(c) (for a Class "D" violent felony the sentence must be at least 2 years and may not exceed 7 years imprisonment). Finally, the trial court was required to, and did, impose the mandatory 5- and 3-year terms of PRS that are applicable to determinate prison terms. See People v. Catu, 4 N.Y.3d 242, 244 (2005). Where, as here, a petitioner's sentence falls within the bounds set by the State legislature, a claim that the sentence is harsh and excessive does not present a Federal constitutional question and thus does not warrant habeas review. White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam) (citation omitted).

## IV. Prosecutorial Misconduct in the Grand Jury

Petitioner repeats her argument made in her pro se supplemental appellate brief that the prosecutor, when presenting the case to the grand jury, deliberately introduced inadmissible evidence and gave erroneous instructions. The Appellate Division held that this claim involved matters outside the record and therefore was not properly raised on direct review. Powell, 79 A.D.3d at 1793.

The Second Circuit has held that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in a federal court." Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) (citing United States v. Mechanik, 475 U.S. 66, 70 (1986) (in

challenge to Federal grand jury proceeding, holding that the petit jury's "subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt" and therefore "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt")). Here, "any alleged deficiency in the grand jury proceeding caused by the State's alleged" misconduct "was cured by [Petitioner's] conviction by the petit jury." Lucius v. Filion, 431 F. Supp. 2d 343, 348 (W.D.N.Y. 2006). This claim must be dismissed. See id.

## V.   Prosecutorial Misconduct At Trial

Petitioner reprises her claim, raised in her pro se appellate brief, that the prosecutor elicited "inflammatory testimony," made misleading arguments, and infused his summation with improper comments. The Appellate Division held that Petitioner failed to preserve her trial-based claims of prosecutorial misconduct by timely objections, and summarily concluded that, in any event, the claims lacked merit. Powell, 79 A.D.3d at 1792-93.

Prosecutorial misconduct amounts to a denial of due process only when it is "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Greer v. Miller, 483 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)). In order to reach that level, the misconduct must

be "'egregious[.]'" <u>Floyd v. Meachum</u>, 907 F.2d 347, 353 (2d Cir. 1990) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 647-48 (1974)).

Petitioner claims that the prosecutor improperly elicited from Jackson the substance of the October 6, 2006, phone call in which Petitioner allegedly stated, "that bitch [i.e., Bryan] called them crackers on me." According to Petitioner, this remark was used to prejudice the "11 white jurors" against her. This was not prosecutorial misconduct but rather an appropriate elicitation of admissible evidence, namely, an admission by Petitioner. <u>See</u>, <u>e.g.</u>, <u>United States v. Russo</u>, 302 F.3d 37, 43 (2d Cir. 2002) ("[S]everal of the out-of-court statements did not fall within the hearsay rule because they were statements of a defendant offered by the prosecution. Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party.") (citing FED. R. EVID. 801(d)(2)(A)).

Petitioner also asserts that the prosecutor improperly asked Jackson leading questions on direct examination. This allegation pertains to an evidentiary matter within the wide discretion of the trial court to address; it does not amount to prosecutorial misconduct. <u>See</u>, <u>e.g.</u>, <u>United States v. Salameh</u>, 152 F.3d 88, 128 (2d Cir. 1998) ("The trial court did not abuse its discretion by allowing the government to ask Igiri whether he 'saw another

vehicle approach the gate.' Although leading questions generally should not be used on direct examination, a district judge may allow them 'as may be necessary to develop the witness' testimony.'") (quoting FED. R. EVID. 611(c)).

Petitioner asserts that the prosecutor improperly cross-examined her. In particular, Petitioner testified that she sustained an injury to her hand on October 6th. The prosecutor elicited that even though she had gone to the hospital on October 7th, she did not request an x-ray of her hand until October 11th, when she was incarcerated. (T.520-21). The prosecutor later argued in summation that the reason Petitioner did not seek treatment until October 11th was because she actually injured her hand during the assault and beating of Jackson on October 8th.   (T.559). Petitioner also filed a criminal complaint relating to the October 6th incident. The prosecutor attempted to establish that, based on the date on the form, Petitioner signed it on October 10th, after the October 8th attack. Petitioner insisted that she signed it on October 6th and that the form had been doctored. (T.522-24). The prosecutor used this testimony to suggest that Petitioner filed the complaint in an attempt to deflect attention from herself and to discredit Jackson. These were proper topics for cross-examination and on which the prosecutor could seek to impeach Petitioner's credibility as a witness. See, e.g., Davis v. Alaska, 415 U.S. 308, 316 (1974) ("Subject always to the broad discretion of a trial

judge to preclude repetitive and unduly harassing interrogation, the . . . cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.").

Petitioner also complains that the prosecutor repeatedly vouched for witnesses. For instance, Petitioner points to the prosecutor's comment, "I would submit that based upon her testimony and the evidence before you [Jackson] was credible." (T.555). Petitioner claims that this was an improper expression of the prosecutor's personal belief in the witness's credibility. However, the prosecutor's use of the phrase "I submit that" on various occasions was not improper, especially given that the defense attacked Jackson's credibility in his summation by arguing she had a motive to lie. See, e.g., United States v. Eltayib, 88 F.3d 157, 173 (2d Cir. 1996) (finding no error where prosecutor, on numerous occasions, prefaced his argument that testimony of prosecution witness was reliable and credible with the phrase "I submit that," was not improper; defendants' lawyers specifically attacked witness' credibility and veracity in their summations, statements that followed the "I submit that" phrase either relied on evidence in the case to corroborate testimony or asked the jurors to draw inferences based on their common sense, and phrase "I submit" expresses not a personal belief but a contention). Moreover, the prosecutor never suggested that he was relying on information other than testimony heard by the jury to establish the witness's

-17-

veracity. See id.

Petitioner faults the prosecutor for accusing her of being untruthful. For instance, she points statement, "And I would submit to you based on the medical records that you will have for your review she told you a blatant untruth regarding the visit to the hospital in an effort to explain away this hand injury which could not be explained away." (T.559). Again, this was not improper; the prosecutor is permitted to argue against the credibility of defense witnesses based on the evidence presented. Although Petitioner claims that the prosecutor characterized her as a "liar," it does not appear that the prosecutor used the words "liar" or "lying" in this case. In any event, "such a practice is not necessarily erroneous as matter of Federal law." Reid v. Giambruno, No. 03-CV-0250 VEB, 2007 WL 3232497, at *21 (W.D.N.Y. Oct. 31, 2007) (citing, inter alia, United States v. Peterson, 808 F.2d 969, 977 (2d Cir. 1996) (direct appeal; holding that it was permissible for the prosecutor to use "liar" when characterizing disputed testimony when the witness's credibility was clearly an issue, unless its use was "excessive or . . . likely to be inflammatory"), cert. denied, 520 U.S. 1132 (1997)).

"A prosecutor's remarks, even if improper and beyond the bounds of fair advocacy, would not warrant the granting of a writ unless the remarks caused the petitioner substantial prejudice." Montero v. Sabourin, No. 02 CIV. 8666(RWS), 2003 WL 21012072, at *6

(S.D.N.Y. May 5, 2003) (citing <u>Bradley v. Meachum</u>, 918 F.2d 338, 343 (2d Cir. 1990), <u>cert.</u> <u>denied</u>, 501 U.S. 1221 (1991)). Here, Petitioner has not established that the prosecutor engaged in conduct outside the bounds of permissible advocacy. Nor has Petitioner shown that her defense was prejudiced by any of the questions or remarks about which she now complains. Therefore, her prosecutorial misconduct claim must fail.

## VI.   Ineffective Assistance of Trial Counsel

In her <u>pro</u> <u>se</u> supplemental appellate brief, Petitioner asserted that trial counsel was ineffective because he failed to (1) call witnesses to testify about Petitioner's good character, Jackson's criminal history, and Terrel's injury that caused him to limp; (2) object to the trial court's ruling that Petitioner must refrain from discussing her community activism during her testimony; (3) preserve various instances of prosecutorial misconduct; (4) request a hearing pursuant to <u>United States v. Wade</u>, 388 U.S. 218 (1967); and (5) request missing witness charges. The Appellate Division held that some of these claims were <u>dehors</u> the record and not properly presented on direct appeal, and some were without merit.

### A.   The <u>Strickland</u> Standard

The Supreme Court set forth the test for ineffective assistance claims in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). A petitioner must demonstrate (1) that her counsel's performance

was deficient, and (2) "that the deficient performance prejudiced the defense." Id. at 687. The Supreme Court has emphasized that counsel is "strongly presumed" to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. Id. at 686, 689-90. To demonstrate prejudice as a result of counsel's performance, the petitioner "must show that there is a reasonable probability that, but for" the alleged errors, the result of the trial would have been different. Id. at 694.

### B.   Alleged Instances of Misconduct

#### 1.   Failure to Call Witnesses

Decisions by counsel regarding whether to call witnesses and which witnesses to call are strategic in nature, and courts are wont to second-guess them. Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (citations omitted). Petitioner believes that defense counsel should have presented witnesses to testify as to her good character as demonstrated by her community service. However, doing so would have opened the door to the prosecution introducing further evidence of Petitioner's multiple prior criminal convictions. See People v. Rojas, 97 N.Y.2d 32, 38 (2001) ("[I]f a defendant offers evidence of good character, the prosecution may independently prove any previous conviction of the defendant tending to negate the trait in issue[.]") (citations omitted). Trial counsel did not act unreasonably in electing not to expose

his client to further character impeachment. In any event, Petitioner was permitted to inform the jury on several occasions that she was an anti-violence activist. With regard to witnesses to testify regarding Terrel's injury, both Jackson and Bryan testified that he walked with a limp. (T.342, 401). Petitioner has not shown how additional testimony about her son's limp or his physical abilities would have had an effect on the outcome of the case. Thus, she has not demonstrated prejudice as a result of counsel's strategic decision. Finally, with respect to Jackson's criminal history, Jackson herself provided testimony on this issue. "Evidence that would be offered solely to further impeach a witness whose character was shown at trial to be questionable is merely cumulative and is not material." United States v. Tutino, 883 F.2d 1125, 1140 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990). Again, Petitioner has failed to demonstrate prejudice as a result of counsel's strategic decision.

### 2.   Failure to Object to Evidentiary Ruling

On direct examination, Petitioner was permitted to testify that she was a community activist. Later, trial counsel asked Petitioner, "Do you carry mace?" Petitioner responded, "No, I am an antiviolence activist. I am against violence." After noting that the answer to counsel's question was "[n]o," the trial court requested that the jury be removed and reprimanded Petitioner for continuing to interject non-responsive commentary about her

community service. The trial court warned that Petitioner's entire
testimony would be stricken from the record if she continued to
mention her community activism. (T.497). Petitioner faults trial
counsel for not objecting to this ruling. "Absent a clear abuse of
discretion, a trial judge retains a wide latitude to exclude
irrelevant, repetitive, or cumulative evidence." United States v.
Holmes, 44 F.3d 1150, 1157 (2d Cir. 1995) (citation omitted). The
trial court here clearly was within its discretion in precluding
Petitioner from continuing to offer cumulative and repetitive
testimony about her activism. Therefore, any objection by trial
counsel would have been overruled, and Petitioner suffered no
prejudice as a result.

### 3.    Failure to Object to Prosecutorial Misconduct

Petitioner faults trial counsel for failing to preserve
various instances of prosecutorial misconduct for appellate review.
However, as discussed above, Petitioner has not demonstrated that
the allegedly improper questions or comments were objectionable.
Furthermore, despite counsel's failure to object, the Appellate
Division reviewed the trial-based prosecutorial misconduct claim
and found that it was without merit. Petitioner thus cannot
demonstrate that she suffered actual prejudice as a result of
counsel's omissions, and her ineffective assistance claim fails.
See, e.g., Walker v. Bennett, 262 F. Supp.2d 25, 40 (W.D.N.Y.
2003).

### 4.   Failure to Request a <u>Wade</u> Hearing

Petitioner asserts that trial counsel was deficient in failing to request a <u>Wade</u> hearing. In <u>Wade</u>, the Supreme Court held that a hearing should be held to determine the admissibility of in-court identifications where the police have conducted pre-trial identification procedures. <u>Wade</u>, 388 U.S. at 235. In this case, however, there were no police-arranged identification procedures. This is not surprising given that Jackson and Petitioner had known each other for more than a decade, and Petitioner voluntarily entered police custody two days after the assault. An attorney's failure to make a motion for which there is no legal basis does not constitute ineffective assistance. <u>See</u>, <u>e.g.</u>, <u>United States v. Caputo</u>, 808 F.2d 963, 967 (2d Cir. 1987) ("We need not reach the second prong of the <u>Strickland</u> standard in this case, for it is evident that trial counsel's failure to make the suppression motion was entirely reasonable. Trial counsel probably realized that the motion would not have been granted because there is no legal basis to support suppression of the restaurant checks.").

### 5.   Failure to Request Missing Witness Charges

Petitioner contends that trial counsel was ineffective in failing to request missing witness instructions regarding RPD Lieutenant Schill, who was one of the officers present when Petitioner turned herself in to the police. With regard to how his testimony would have assisted the defense, Petitioner simply argues

that since Lieutenant Schill was involved in the investigation regarding the October 6, 2006, incident and was one of the two officers who arrested her on October 10, 2006, he should have been called to testify. It thus remains unclear what non-cumulative testimony Lieutenant Schill could have provided. "No [missing witness] instruction is necessary where the unpresented testimony would be merely cumulative." United States v. Torres, 845 F.2d 1165, 1169 (2d Cir. 1988). Since a missing witness charge in all likelihood would not have been granted, Petitioner has not demonstrated prejudice as a result of counsel's decision.

Petitioner asserts that there was another missing witness named Chad Jackson, Jackson's son, who gave a written statement on the night of October 8, 2006, stating he recognized one of the perpetrators to be "T.J.", i.e., Terrel, Petitioner's son. Petitioner states that Chad Jackson later recanted his statement when the investigating officer returned to obtain another statement; on the second occasion, he said that he did not see T.J. but had just heard that he was there. According to Petitioner, this "recanted information would have impeached the credibility of the key prosecutor's witness testimony." Petitioner has not established entitlement to a missing witness instruction as to Chad Jackson for several reasons, the most obvious of which is that he would not be "expected to testify favorably" for the prosecution. See, e.g., People v. Keen, 94 N.Y.2d 533, 539 (2000) (proponent of missing

witness charge bears burden of showing that "there is an uncalled witness believed to be knowledgeable about a material issue pending in the case, that such witness can be expected to testify favorably to the opposing party and that such party has failed to call him to testify").

## VII. Actual Innocence

Petitioner urges the Court to find that she has articulated a meritorious claim of actual innocence sufficient to serve as a "gateway" for the Court to review defaulted claims. See House v. Bell, 547 U.S. 518, 536-37 (2006) ("[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. . . .'") (quotation omitted). However, because the Court has overlooked the procedural defaults and considered all of Petitioner's claims on the merits, she has no need to use a claim of actual innocence as a "gateway" to obtain habeas review of defaulted claims.

In any event, the Court finds that Petitioner's newly discovered evidence does not suffice under the "demanding," House, 547 U.S. at 538, standard articulated in Schlup v. Delo, 513 U.S. 298 (1995), which allows actual innocence to serve as a gateway to review only in the "'extraordinary'" case. Id. at 327 (quotation omitted). Petitioner's newly discovered evidence consists of "police reports for Jackson's 2002 forgery conviction, evidence

that Jackson probably used cocaine in 2001 and was less truthful than the prosecutor asserted." (Pet., p. 32). Petitioner also characterizes Jackson as "living a street-involved lifestyle where her peer group resolved disputes through violence." Petitioner claims that trial counsel failed to explain to the jury the extent of her son's injury, which would have prevented him from participating in the attack. (Pet., p. 33). Petitioner also references letters from her attorney to the trial court, indicating that a 911 recording probably had an audible sample of Jackson saying that Jackson did not know who attacked her, but there was too much static; that counsel requested funds to pay an audio expert to clear up the static; but that, after having the tape analyzed, counsel did not introduce it at trial. (Pet., pp. 41-42). Petitioner postulates that Jackson may have been involved in an insurance fraud scheme with Rent Way, a local rental store, whereby Jackson would fake a burglary in her home so that Rent Way could collect insurance benefits. (Pet., p. 43). Petitioner also suggests that the RPD framed her for the crime in retaliation for her community activism and protests against police violence. (Pet., p. 46).

To make the requisite showing of actual innocence, Schlup requires the petitioner to produce "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not

presented at trial" and "must show that it is more likely than not that no reasonable juror would have convicted [her] in the light of the new evidence. <u>Schlup</u>, 513 U.S. at 324, 327. While Petitioner acknowledges that "none of [her] evidence alleges facts that would be as exculpatory," she asserts that she "provides more evidence of greater credibility." (Pet., p.  54). Petitioner's argument is unavailing. The Supreme Court has repeatedly stated that newly discovered impeachment evidence "is a step removed from evidence pertaining to the crime itself" and "tends only to impeach the credibility of" the witness. <u>Calderon v. Thompson</u>, 523 U.S. 538, 563 (1998) (finding that petitioner's additional "impeachment evidence provides no basis for finding a miscarriage of justice") (citing <u>Sawyer v. Whitley</u>, 505 U.S. 333, 349 (1992)). Here, the allegedly new evidence Petitioner has offered goes only to the credibility of the complainant, Jackson. It does not "make a clear and convincing showing that no reasonable juror would have believed the heart of [Jackson]'s account of [P]etitioner's action," <u>Sawyer</u>, 505 U.S. at 349, and therefore it does not meet the <u>Schlup</u> standard. <u>See</u> <u>id.</u>

Finally, to the extent that Petitioner asserts actual innocence as a stand-alone claim for habeas relief, it must be dismissed as not cognizable. <u>See</u> <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993). In <u>Herrera</u>, the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been

held to state a ground for federal habeas relief absent an
independent constitutional violation occurring in the underlying
state criminal proceeding." Id. Even if the Supreme Court were to
recognize such a claim, it noted in House that "at the least . . .
Herrera requires more convincing proof of innocence than" the
Schlup standard, which requires a showing that it is "more likely
than not [that] any reasonable juror would have reasonable doubt."
House, 547 U.S. at 538, 554-55. Since Petitioner's evidence falls
far short of Schlup, it could not succeed under Herrera, assuming
an actual innocence claim could provide a basis for habeas relief.

## THE REQUEST FOR AN EVIDENTIARY HEARING

Petitioner requests that the Court subpoena the City of
Rochester, Monroe County, her trial counsel, Willard Drug Treatment
Campus, Rochester General Hospital, St. Mary's Hospital, "as well
as other entities" which allegedly possess "exculpatory evidence."
(Pet., p. 1). The Court assumes that this evidence relates to
Petitioner's arguments, set forth in the remainder of the petition,
supporting her claim of actual innocence.

Under the Anti-terrorism and Effective Death Penalty Act
("AEDPA"), which applies to the instant petition, a petitioner
must, in addition to showing diligence in state court, allege a
colorable claim for relief, in order to obtain an evidentiary
hearing. See Schriro v. Landrigan, 550 U.S. 465, 474-75 (2007). "To
allege a colorable claim, he must allege facts that, if true, would

entitle him to habeas relief." <u>West v. Ryan</u>, 608 F.3d 477, 485 (9th Cir. 2010) (citing <u>Landrigan</u>, 550 U.S. at 474). Where, as here, "the record refutes the applicant's factual allegations or otherwise precludes habeas relief," <u>Landrigan</u>, 550 U.S. at 474, the Court "is not required to hold an evidentiary hearing." <u>Id.</u>

### THE REQUEST FOR A STAY AND TO AMEND

Petitioner requests permission to return to State court to file a petition for a writ of error <u>coram</u> <u>nobis</u> in the event that this Court denies her actual innocence claim. The Court agrees with Respondent's interpretation of this request as a motion by Petitioner for a stay of the proceedings and for permission to amend her petition to add claims. As discussed below, Petitioner has not demonstrated entitlement to either form of relief.

In <u>Rhines v. Weber</u>, 544 U.S. 269, 277 (2005), the Supreme Court approved the "limited" use by district courts of the stay-and-abeyance procedure described by the Second Circuit in <u>Zarvela v. Artuz</u>, 254 F.3d 374, 380 (2d Cir.), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u> <u>Fischer v. Zarvela</u>, 534 U.S. 1015 (2001)). In order to invoke the "stay-and-abeyance" procedure, a district court must ensure that (1) good cause exists for the petitioner's failure to exhaust her claims in state court; (2) the unexhausted claims are not "plainly meritless," and (3) the petitioner has not engaged in intentionally dilatory litigation tactics. 544 U.S. at 277-78. Here, Petitioner has failed to explain why she has not yet

instituted a <u>coram</u> <u>nobis</u> proceeding. Thus, she cannot establish "good cause" for failing to exhaust her proposed ineffective assistance claims. Indeed, the Court finds that "good cause" cannot be demonstrated on the present record, since Petitioner would have been aware of the substance of the ineffective assistance of appellate counsel claims at the time appellate counsel filed his brief. "The absence of 'good cause' for the failure to exhaust is fatal to Petitioner's ability to fulfill the <u>Rhines</u> standard." <u>Carr</u> <u>v. Graham</u>, 27 F. Supp.3d 363, 365 (W.D.N.Y. 2014) (citing <u>Rhines</u>, 544 U.S. at 277 ("Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.")).

"Because the claims Petitioner wishes to add are unexhausted, the Court's refusal to grant a stay necessarily means that it would be futile to grant Petitioner's request to amend the petition, since [she] would be adding unexhausted claims on which the Court could not grant habeas relief." <u>Carr</u>, 27 F. Supp.3d at 365 (citing 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); other citation omitted). Therefore, Petitioner's request to amend is denied as futile. <u>See</u> <u>Richardson Greenshields Sec.,</u>

<u>Inc. v. Lau</u>, 825 F.2d 647, 653 n. 6 (2d Cir. 1987) ("A motion to amend should be denied only for such reasons as 'undue delay, bad faith, futility of the amendment. . . .'") (quotation omitted).

### CONCLUSION

For the foregoing reasons, Petitioner's application for a writ of habeas corpus is **denied**, and the petition (Dkt #1) is **dismissed.** Petitioner's requests for a stay, for permission to amend the petition, and for an evidentiary hearing are **denied with prejudice.** Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is **denied.** <u>See</u> 28 U.S.C. § 2253(c)(2).

SO ORDERED.

**S/ Michael A. Telesca**

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:      May 19, 2016
            Rochester, New York.

-31-